2024 IL App (1st) 240363-U

FIRST DIVISION
May 6, 2024

No. 1-24-0363B

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee | ) ) | Cook County. |
| v. | ) ) | No. 19 CR 0993102 |
| KIRBY BRAME, | ) ) | Honorable Nicholas Kantas, |
| Defendant-Appellant. | ) ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court did not abuse its discretion in denying pretrial release.

¶ 2     The defendant-appellant, Kirby Brame, appeals from the circuit court's January 31, 2024 order, granting the State's petition for denial of his pretrial release pursuant to section 110-6.1(a) of the Code of Criminal Procedure of 1963 (Code) as recently amended by Public Acts 101-652, § 10-255 and 102-1104, § 70 (eff. Jan. 1, 2023) (725 ILCS 5/110-6.1(a)(1), (6) (West 2022)), and

commonly referred to as "the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act" or the "Pretrial Fairness Act" (Act). See also Ill. S. Ct. R. 604(h) (eff. Oct. 19, 2023); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). On appeal, the defendant argues that the State failed to prove by clear and convincing evidence that he committed an eligible detainable offense and poses a real and present threat to the safety of the community, and that no conditions of release can mitigate the risk of that threat. For the following reasons, we affirm.

¶ 3                                    II. BACKGOUND

¶ 4      This appeal stems from the June 22, 2019, shooting on the 3900 block of West Lexington Street, in Chicago, which resulted in the death of one victim and serious injuries to another. Together with codefendant Maurice Myers, the defendant was charged with first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) based on accountability principles for his involvement in this shooting.

¶ 5      Initial bond hearings were held on June 24, 2019, and July 19, 2019.[1] At the July 19, hearing the State proffered that at about 6 p.m. on June 22, 2019, the 28-year-old defendant was working at a Boost Mobile cell phone store located at Harrison Street and Pulaski Road in Chicago, when the 22-year-old codefendant Myers came into his store agitated and upset. Codefendant Myers told the defendant to "let me get that." The defendant then went to the back of the store, retrieved a fanny pack, which contained a .38 caliber handgun and gave the handgun to the codefendant. Codefendant Myers put the handgun in his waistband, received a black hooded sweatshirt from the defendant, put it on, and exited the store. Codefendant Myers then walked

---

[1] The June 24 hearing was premised solely on the aggravated discharge of a firearm charge and resulted in denial of bond. After one of the victims succumbed to his injuries and the State additionally charged the defendant with first degree murder based on accountability principles, the parties proceeded with the July 19, 2019, bond hearing.

south to the vicinity of 3939 West Lexington Street and began shooting east toward the 3900 block of West Lexington Street. A witness observed the codefendant firing these shots. The shots struck one victim, 18-year-old Demetrius Parks, in the head. The people that were at the 3900 block of West Lexington Street, then returned fire toward codefendant Myers and struck the second victim, 56-year-old Grana Milton, in the buttock.

¶ 6    The State proffered that Parks subsequently died as a result of his injuries, and that Milton had to undergo an operation to have a portion of his colon removed as a result of his gunshot wound.

¶ 7    According to the State, after the shooting, codefendant Myers fled north and returned to the Boost Mobile store. Surveillance video footage recovered from that store showed codefendant Myers handing the gun back to the defendant, and the defendant subsequently hiding the gun and the codefendant in the back of the store. After Chicago police officers obtained entry into the store, they found codefendant Myers with two other individuals in the back. The officers placed all four men, including the defendant, into custody.

¶ 8    The State further proffered that the officers recovered a .38 caliber handgun from the store and that that shell casings retrieved from the scene of the shooting were consistent with having been fired from that recovered gun.

¶ 9    The State also proffered that both the defendant and codefendant Myers made videotaped confessions to the police. In his videotaped statement, the defendant admitted that he gave the gun to codefendant Myers and later hid it. Consistently, codefendant Myers stated that he had seen someone who had robbed him earlier, so he went, got the gun, and shot at them.

¶ 10    After the proffer, the State discussed the defendant's criminal background, which included: (1) an active order of protection, which was set to expire on January 2022; (2) a 2018 felony

conviction for unlawful restraint from Dekalb County, for which the defendant received 18 months' probation, which had not yet terminated; (3) a 2017 misdemeanor conviction for resisting arrest from Kendall County; and (4) a 2010 misdemeanor conviction for false imprisonment from Nashville, Tennessee.

¶ 11 The circuit court next asked for the recommendation of a representative from "pretrial services," who indicated that the defendant's "new criminal activity" score was six out of six, and his "failure to appear" score was five out of six. The defendant also had a violence flag. Accordingly, the "pretrial services" recommendation was for "maximum conditions."

¶ 12 In mitigation, defense counsel argued that the defendant should be released on bail because he was a family man and a life-long resident of the Chicagoland area. According to defense counsel the defendant's fiancée and father were in the courtroom. The defendant had five children with a sixth on the way and had worked for Boost Mobile for over three years prior to the offense supporting his family. According to defense counsel the defendant had no reason not to come to court, and instead sought a reasonable bond so that he could fight his case, while providing for them.

¶ 13 After hearing the parties' arguments, the circuit court denied bond. The court stated that it had considered the nature and circumstances of the charged offense, the possible sentence upon conviction, the likelihood of conviction and the weight of the evidence. In addition, it had considered the "maximum conditions" recommended by "pretrial services" based on the defendant's new criminal activity flag. On this basis, the court found that the proof was evident that the defendant had committed the non-probationable offenses with which he was charged, and that he posed a real and present threat to the physical safety of the community.

¶ 14 On April 27, 2020, during the COVID-19 pandemic, defense counsel filed a motion to

reduce bond and for release of the defendant on his own recognizance, arguing that the defendant should be released from prison pending trial because he suffered from extreme asthma and was at a higher risk of death while in prison.[2]

¶ 15    On May 1, 2020, the circuit court held a hearing on that motion. There, defense counsel argued that the defendant had suffered from asthma his entire life, that he was having trouble obtaining inhalers in jail and that he was therefore at an extremely high risk of health complications and death while in jail. Defense counsel asked the court to grant pretrial release with electronic monitoring or an I-bond.

¶ 16    The court stated that while it understood the dangers faced by the defendant in jail, based on the allegations and the defendant's background, he posed a real and present threat to the safety of the community and no condition or combination of conditions could "reasonably ensure" that he would "adhere." The court therefore held that no bail was appropriate and denied the defendant's motion to reduce bond.

¶ 17    After the recent passage of the Pretrial Fairness Act, on January 18, 2024, the defendant filed a petition for pretrial release pursuant to sections 110-5(e) and 110-7.5(b) (725 ILCS 5/110-5(e), 7.5(b) (West 2022)). Therein, he reasserted that he should be released pending trial because he suffers from asthma and his family needs his financial support.

¶ 18    On January 31, 2024, the State filed the instant verified petition seeking to deny the defendant's pretrial release pursuant to sections 110-2, and 110-6.1(a)(1), (a)(1.5) of the Act (725 ILCS 5/110-2, 110-6.1(a)(1), (a)(1.5) (West 2022)). Therein, the State alleged that the defendant

---

[2] While this motion is not part of the record on appeal and is instead included as an exhibit to the State's response to the defendant's appeal in this case, we may take judicial notice of it as it is a public document filed in the circuit court. See *Metropolitan Life Ins. Co. v. American Nat'l Bank & Trust Co.*, 288 Ill. App. 3d 760, 764 (1997) ("This court may take judicial notice of public documents that are included in the records of other courts.")

was being charged with a non-probationable forcible felony and that his pretrial release posed a real and present threat to the safety of the community because he tendered a gun to codefendant Myers, who then used that gun to kill someone. The State further asserted that based on the specific and articulable facts of that case, no condition or combination of conditions that the court could impose would mitigate the risk of that threat.

¶ 19    On January 31, 2024, together with codefendant Myers, the defendant appeared in court for a hearing on the two petitions.

¶ 20    At that hearing, defense counsel argued that the State could not overcome the presumption that the defendant should be released pretrial because the defendant's participation in the instant offense was minor as he was not present for the shooting. Specifically, according to defense counsel the defendant at most aided and abetted codefendant Myers by tendering him the murder weapon and then subsequently trying to stop the police from entering the store to apprehend the codefendant. In addition, defense counsel pointed out that the defendant suffers from asthma, is married, and has three children, who depend on him financially and who he was supporting by working as a manager at the cell phone store prior to his arrest.

¶ 21    In response, and in support of its petition seeking pretrial detention, the State reiterated the underlying facts of this case. Specifically, the State proffered that at around 6 p.m. on June 22, 2019, the defendant was working inside the Boost Mobile store when codefendant Myers entered and informed him that he had just been robbed "by a group of people known to the area." Codefendant Myers then instructed the defendant to retrieve a gun. The defendant went to the back of the store, and returned moments later with a zipped bag, from which he removed a firearm. Codefendant Myers took the firearm and began to leave the store, but the defendant stopped him and suggested that he wear a hoodie to cover the gun. Codefendant Myers then retrieved a hoodie,

which was too small and then selected a larger one, which he put on and used to cover the firearm before leaving the store.

¶ 22    The State further proffered that codefendant Myers then met up with another individual, who was eventually charged with possession of a controlled substance (hereinafter the PCS codefendant). The two of them then walked toward the 3900 block of West Lexington Street. Standing on the corner of Pulaski Road, and facing east onto Lexington Street, codefendant Myers opened fire on the people that he believed to be responsible for the robbery. After these unknown individuals returned fire, codefendant Myers ran back to the Boost Mobile store, where he informed the occupants of his actions. The defendant took the gun from codefendant Myers and the two went to the back of the store.

¶ 23    The PCS codefendant then entered the store irate and began calling codefendant Myers names before proceeding to the back of the store with him. The defendant then emptied the store of all occupants except for codefendant Myers, the PCS codefendant, and another witness and a baby that was inside a car seat on top of the counter. The four men then went to the back of the store and hid. After a while, the defendant returned to the front of the store to speak with the police. The defendant blocked the officers' access to the store and told them that no one was inside. However, the police were able to contact the store owner and eventually gained access from the back alley.

¶ 24    The police detained all of the individuals inside the store, and recovered two guns, two hoodies and video evidence. Five shell casings recovered from the scene of the shooting matched the caliber of firearm which the police recovered from the back of the store and which the defendant handed to codefendant Myers.

¶ 25    The State further proffered that neither of the two victims of the shooting, one of whom

subsequently died of his injuries, was directly linked to the alleged robbing of codefendant Myers.

¶ 26    The State also proffered that both the defendant and codefendant Myers gave incriminating statements to the police, which were videotaped.

¶ 27    The State next published a series of ten video clips showing portions of those confessions, and the defendant's actions inside the store prior to and after the shooting. These video clips, however, are not part of the record on appeal.

¶ 28    After introducing the video evidence, the State discussed the defendant's prior criminal background. Once again, the State noted that the defendant had one prior felony conviction for unlawful restraint and domestic battery from 2018 for which he received 18 months' probation, and which terminated unsatisfactorily. The State further noted that the defendant had four prior misdemeanor convictions, including: (1) a 2017 conviction for resisting a peace officer, for which he was sentenced to six months; (2) 2014 convictions for domestic battery and unlawful use of a weapon without a Firearm Owners Identification (FOID) card, for which he received probation; and (3) 2010 convictions for contributing to the delinquency of a minor, false imprisonment and a domestic related assault, from Nashville, Tennessee.

¶ 29    After hearing all the evidence, the circuit court first found that the State met its burden in proving by clear and convincing evidence that the defendant committed the charged offenses. The court observed that the State's proffered evidence establishing that the defendant handed over the firearm to the shooter was corroborated by the video evidence. The court noted that the video evidence showed that the defendant acted "nothing short of nonchalant" when handing over the weapon to codefendant Myers. As the court observed, within "mere seconds" the defendant had the gun "ready to go." "He [went] in the back and hand[ed] it over." The court further noted:

        "I can't even imagine how much conversation could have possibly gone to warrant a going

and grabbing a gun but it was not a lot, no matter what the substance of it was, it didn't take much prompting for [the] defendant *** to go and get a gun and hand it over."

¶ 30    The circuit court next found that the defendant posed a real and immediate threat to the safety of the community. The court noted that as a result of the defendant's actions, codefendant Myers shot at a group of people in the street, resulting in the death of one victim and serious injuries to the other. As the court stated:

"I cannot stress more how dangerous it was to be shooting a loaded gun on the streets of Chicago at 6 o'clock in summer, nothing is more evident to that than the fact that two people were shot, one person was killed."

The court also found relevant that according to the video evidence, the defendant did not seem to appreciate the gravity of his own conduct. As the court explained:

"The only person that actually acted alarmed by really any of this is this other individual who was arrested for PCS who came in wearing the white tank top, he seemed pretty outraged by what had happened, but the defendant[] and [codefendant] Myers didn't appear to me to seem too concerned about what had happened."

¶ 31    The circuit court next found that despite the mitigating evidence offered by defense counsel, which it had considered, there was no condition beyond detention that could mitigate the defendant's real and present threat to the community "based on the egregious nature of the facts of this case."

¶ 32    Accordingly, the circuit court granted the State's petition and ordered that the defendant be detained pretrial. The defendant now appeals. See Ill. S. Ct. R. 604(h) (eff. Oct. 19, 2023).

¶ 33                                    II. ANALYSIS

¶ 34   On appeal, the defendant argues that the State failed to prove by clear and convincing evidence that he committed an eligible detainable offense and poses a real and present threat to the safety of the community, and that no conditions of release can mitigate the risk of that threat. For the following reasons, we disagree with the defendant.

¶ 35   At the outset we set forth the relevant pretrial-release provisions of the new statute. Pursuant to sections 110-2-1(a) and 110-6.1(e) of the Act, all defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a), 110-6.1(e) (West 2022). The State may detain an accused if it establishes that the charged offense is eligible for detention and then proves that: (1) the proof is evident or the presumption great that the defendant committed an offense which qualifies him for pretrial detention; (2) the defendant poses a real and present threat to the safety of any specific person or persons or the community, based on the specific articulable facts of the case; and (3) no condition or combination of conditions can mitigate that real and present threat. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 36   The State must prove each and every one of these three elements by clear and convincing evidence. *Id*. Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." (Internal quotation marks omitted.) *In Re Tiffany W*., 2012 IL App (1st) 102492-B, ¶ 12. It "is more than a preponderance but less than is required to convict an individual of a criminal offense." *Id*. If the State fails to carry its burden on any of these three elements, the presumption of release remains, and the detention is unlawful. 725 ILC 5/110-6.1(e) (West 2022).

¶ 37   At present, our courts disagree as to the appropriate standard of review. Some appellate decisions have concluded that all aspects of detention hearings under the Act are subject to abuse of discretion (see *People v. Whitmore*, 2023 IL App (1st) 231807, ¶¶ 18-19; *People v. Inman*, 2023

IL App (4th) 230864, ¶ 11) while others have exclusively utilized the manifest weight of the evidence standard (see *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12; *People v. Rodriguez*,2023 IL App (3d) 230450, ¶ 8). Other courts have adopted a mixed approach, under which the circuit court's determinations that the State has proved by "clear and convincing evidence" that the defendant committed a qualifying offense, and that he is dangerous, is reviewed for the manifest weight of the evidence, while the ultimate decision regarding detention, or the imposition of conditions of release are subject to abuse of discretion review. See *People v. Parker*, 2024 IL App (1st) 232164, ¶ 50; *People v. Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36; *People v. Hodge*, 2024 IL App (3d) 230543, ¶ 8; *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 10; *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24, 31. Still others have concluded that appeals under the Act should be reviewed *de novo.* See *People v. Battle*, 2023 IL App (1st) 231838, ¶ 18; *Saucedo*, 2024 IL App (1st) 232020 (Ellis, J., specially concurring); see also *People v. Herrera*, 2023 IL App (1st) 231801, ¶¶ 22-24 (declining to decide what standard of review applies, but suggesting that even under *de novo* review, the case could be resolved based on legal error).

¶ 38     While we would affirm the instant detention order under any standard, we agree with the rationale of those decisions that hold that detention orders under the Act should be reviewed for an abuse of discretion. *Whitmore*, 2023 IL App (1st) 231807(B), ¶¶ 18-19; *People v. Inman*, 2023 IL App (4th) 230864, ¶ 11. An abuse of discretion occurs when the circuit court's " 'ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the circuit court.' " *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24 (quoting *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009)); see *People v. Johnson*, 2019 IL App (3d) 190582, ¶ 8. In addition, as the reviewing court, we may not substitute our judgment for that of the circuit court merely because

we would have analyzed the appropriate factors differently. *Inman*, 2023 IL App (4th) 230864, ¶ 11.

¶ 39    Turning to the merits of the defendant's contentions, we begin by addressing whether the State proved by clear and convincing evidence that the proof is evident or the presumption great that the defendant committed the charged offenses. In this respect, the defendant contends that while in prior hearings before other judges in the circuit court the State indicated that the defendant was charged with first degree murder and aggravated battery with a firearm, for purposes of the instant petition, the State never identified the eligible detainable offenses either in the petition, on the record, or at the pretrial detention hearing. We disagree.

¶ 40    Contrary to the defendant's position, a review of the record reveals that the circuit court, and all the parties to the petition were well-aware that the defendant was charged with first degree murder, which is a detainable offense under section 110-6.1(a)(1.5) of the Act (725 ILCS 5/110-6.1(a)(1.5) (West 2022) (first- and second-degree murder are both detainable offenses under the Act). The criminal disposition sheet, containing the circuit court's prior orders clearly lists the defendant's charges, which include two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)) and one count of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)). Moreover, during the instant hearing, in arguing that the defendant's involvement in the case was "minor," since he was not the shooter, defense counsel explicitly acknowledged that this was a murder case.

¶ 41    What is more, at the hearing on the instant petition, the State proffered that the defendant gave codefendant Myers a handgun and a sweatshirt to conceal that gun, after which codefendant Myers walked down the street and shot at a crowd of people killing a man. The State further proffered that the defendant ran back to the store, where he returned the gun to the defendant. The

defendant then hid the gun and codefendant Myers in the back of the store and actively tried to conceal him when the police arrived. Based on this proffer and the video evidence corroborating it, the circuit court found that there was clear and convincing evidence that the proof was evident and the presumption great that the defendant had committed the charged detainable offense of murder even though he himself was not the shooter. We find nothing arbitrary, fanciful, or unreasonable in this conclusion. *Inman*, 2023 IL App (4th) 230864, ¶ 11.

¶ 42    We next address whether the State proved by clear and convincing evidence that the defendant was a real and present threat to the safety of the community. 725 ILCS 5/110-6.1(e) (2) (West 2022). The Act provides a non-exhaustive list of factors that the circuit court may consider in assessing the defendant's "dangerousness" including, *inter alia*: (1) the nature and circumstances of the offense; (2) the defendant's criminal and social history; (3) the defendant's access to weapons; and (4) whether the defendant committed any offense while on some form of release from custody. 725 ILCS 5/110-6.1(g) (West 2022).

¶ 43    In the present case, on appeal, the defendant asserts that the State failed to meet its burden because it never argued that the defendant posed any threat to any particular person or the community in general and merely relied on the allegations against codefendant Myers to support the position that the defendant was equally dangerous. We disagree.

¶ 44    Contrary to the defendant's position, the circuit court's findings did not merely "lump" the defendant with codefendant Myers. Instead, the majority of circuit court's oral pronouncement was spent on discussing the defendant's own conduct. Specifically, in finding that the defendant posed a real and immediate threat to the safety of the community, the circuit court not only relied on the defendant's access to and delivery of the firearm to codefendant Myers, but also on his

nonchalant attitude to arming the codefendant and his subsequent concealment of both the murder weapon and the shooter. See 725 ILCS 5/110-6.1(g) (West 2022).

¶ 45    In finding that the defendant posed a threat to the community, the circuit court noted that according to the video evidence the defendant acted "nothing short of nonchalant" when handing over the weapon to codefendant Myers. As the court observed:

"[W]hen the shooter comes in, tells him whatever, mere seconds pass[] and he has that gun ready to go. He goes in the back and hands it over. I can't even imagine how much conversation could have possibly gone to warrant a going and grabbing a gun but it was not a lot, no matter what the substance of it was, it didn't take much prompting for [the] defendant *** to go and get a gun and hand it over."

¶ 46    The court further found that the defendant did not seem to appreciate the gravity of his actions, which resulted in codefendant Myers "shooting a loaded gun on the streets of Chicago at 6 o'clock in the summer" hitting two and killing one person. Instead, he focused on hiding his involvement by "block[ing] the police from entering" the Mobile Boost store "to help secrete and hide" codefendant Myers. As the court observed:

"[t]he only person that actually acted alarmed by really any of this is this other individual who was arrested for PCS who came in wearing the white tank top, he seemed pretty outraged by what had happened, but the defendant[] *** didn't appear to me to seem too concerned about what had happened."

¶ 47    Under this record, and in light of the statutory factors considered by the circuit court, we fail to see how the court's determination that the defendant posed a safety risk to the community could be construed as "unreasonable, fanciful or arbitrary." *In re Marriage Heroy*, 2017 IL 120205, ¶ 24. Accordingly, we conclude that the court did not abuse its discretion in finding that

the defendant posed a real and present danger to the community, requiring pretrial detention.

¶ 48    Lastly, we address whether any conditions of release could have mitigated the risk of that threat. 725 ILCS 5/110-6.1(e) (3) (West 2022). Section 110-5 of the Act lists the factors that the circuit court may consider in determining the conditions of release. 725 ILCS 5/110-5 (West 2022). These factors mirror those the court can consider in determining the defendant's "dangerousness" and include the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and whether the defendant was on parole at the time of the offense. 725 ILCS 5/110-5(a)(1), (2), (3)(b) (West 2022); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 49; *People v. Jones*, 2023 IL App (4th) 230837, ¶ 32; *People v. Reed*, 2023 IL App (1st) 231834, ¶ 31.

¶ 49    In addition, section 110-10 of the Act (725 ILCS 6/110-10(b) (West 2022)) sets forth potential conditions for pretrial release, including reporting in person, refraining from possessing a firearm, refraining from communicating with particular persons, refraining from going to certain areas, and being under home supervision with or without electronic monitoring. All of these conditions require that a defendant be able and willing to comply with and respect the government actors and property necessary to enforce them. See *People v. Parker*, 2024 IL App (1st) 232275-U, ¶ 44.

¶ 50    In the present case, the defendant contends that the State offered no evidence or discussion regarding why less restrictive means beyond detention could not mitigate the purported risk posed to the community by his pretrial release. In support, the defendant cites *People v. Stock*, 2023 IL App (1st) 231753. For the following reasons, we disagree and find that decision inapposite.

¶ 51    In *Stock*, the appellate court reversed the defendant's detention order because the State failed to present *any* evidence regarding conditions of release and instead relied only on the basic elements of the offense—aggravated battery based on the defendant's alleged firing of a gun at his

wife and injuring her as she attempted to remove her belongings from the marital home while seeking a divorce—as the backbone for its argument supporting the defendant's detention. *Id.* This is simply not the case here.

¶ 52    In the present case, the State presented evidence, and not mere conclusory statements, that showed why no less restrictive conditions would mitigate the defendant's risk to the community. After proffering evidence that the defendant had provided codefendant Myers with the firearm that was subsequently used to indiscriminately shoot at a crowd of people in the street, killing one person and seriously injuring another, the State presented evidence of the defendant's prior criminal history, which included the fact that the defendant was on parole for a violent offense at the time he committed the instant crime. The defendant's criminal background also included the defendant's prior illegal possession of firearms. Thus, unlike in *Stock*, here the State explicitly offered evidence of the defendant's inability to conform his behavior to legal requisites which would be necessary for his compliance with any conditions of release set by the court.

¶ 53    Having heard this evidence, the circuit court found that despite the mitigating evidence offered by defense counsel, there was no condition of release that could mitigate the defendant's threat to the public based on the "egregious nature of the facts of this case." In articulating those facts, among other things, the court focused on the dangerousness of the defendant's nonchalant delivery of the firearm to codefendant Myers, and his subsequent lack of concern regarding his actions. Under this record, we find nothing "arbitrary, fanciful or unreasonable" in the circuit court's assessment. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 54    For these reasons, we conclude that the circuit court did not abuse its discretion in finding that the State proved by clear and convincing evidence that the proof was evident and the presumption great that the defendant committed the charged detainable offense of murder, that he

posed a real and present threat to the safety of the community, and that there were no conditions that would mitigate against that threat. Accordingly, we affirm the order of pretrial detention.

¶ 55   Affirmed.